1

2          UNITED STATES DISTRICT COURT

3       FOR THE NORTHERN DISTRICT OF CALIFORNIA

4              OAKLAND DIVISION

5

6  ANDREW POWERS,                    Case No:  C 10-0365 SBA (PR)

7          Petitioner,              **ORDER DENYING PETITION FOR**
                                    **WRIT OF HABEAS CORPUS**
8      vs.

9
   DAVE DAVEY, Warden,[1]
10
11         Respondent.

12

13      Petitioner Andrew Powers ("Petitioner") brings the instant pro se habeas action

14  under 28 U.S.C. § 2254 to challenge his 2006 conviction and 2007 sentence rendered in the

15  Sonoma County Superior Court.  Having read and considered the papers filed in connection

16  with this matter and being fully informed, the Court hereby DENIES the Petition for the

17  reasons set forth below.

18  I.    **BACKGROUND**

19      A.   **STATEMENT OF FACTS**

20      The following facts are taken from the opinion of the California Court of Appeal

21  ("Court of Appeal" or "state appellate court"):

22          **A.** *The Victim; Witnesses at the Apartment*

23              Decedent Darin James Bond was a small-scale marijuana
            dealer, selling small amounts from his apartment that he shared
24          with Dennis Diaz in Windsor.  There were no guns at the
            apartment, but Diaz had a sword in a sheath that he kept by his
25          bed.

26  _____

27      [1] Dave Davey, the current acting warden of the prison where Petitioner is
    incarcerated, has been substituted as Respondent pursuant to Rule 25(d) of the Federal
28  Rules of Civil Procedure.

Bond was cautious; no stranger ever came to the apartment to purchase marijuana unless in the company of a mutual friend.  Bond kept the marijuana in a safe.  If someone did not pay at the time of receiving the marijuana, Bond maintained a running tab of what was owed.  He wore a silver Raiders ring with a black stone, and a silver watch.

On the evening of December 18, 2003, Kimberly Saleh, a friend of Bond, John Kaehler, a friend of both roommates, and Josh Freeland were at the Windsor apartment, along with Bond and Diaz.  Saleh and Freeland were frequent visitors to Bond's apartment.

Saleh left around 10:30 p.m.  She told Bond she would come over the next day around 10:30 a.m.  Kaehler spent the night.  Around 11:00 p.m. or midnight, Freeland and someone else came to the door.  Diaz yelled to Freeland to come back tomorrow.

Diaz left for work around 7:00 a.m. on December 19, 2003.  After Diaz left, Freeland came over with another person, looking to buy "an 8th" of marijuana.  They were dressed in black with black gloves.  Bond answered the door; he was upset that they came by so early and woke him up.  After Bond quoted a price the two men left, saying they forgot the money in their truck, but then took off.  Kaehler left the apartment around 7:30 or 8:00 a.m.  He returned to Bond's apartment between 10:00 and 10:30 a.m., knocked on the door but there was no response.  The door to the apartment was not tight against the jamb.  Kaehler went back around 11:00 or 11:45 a.m., knocked again, but there was still no answer.

**B.  *Saleh Discovers Bond***

Saleh called Bond several times starting at 10:30 a.m., but no one answered.  At midday she came by the apartment, knocked, opened the door—it was unlocked—and discovered his body.  Bond's body was on the floor, covered with a blanket.  Blood was on the walls; the apartment was "completely trashed."

**C.  *The Crime Scene and Body***

Police arrived around 12:40 p.m.  The apartment was in "general disarray."  Furniture had been overturned.  Clothes from the closet were strewn on the floor.  The top of the toilet tank had been removed and set aside.  It appeared as though the place had been searched.

On top of a dresser was a locked safe.  The key was located, the safe unlocked; it contained approximately 55 grams of marijuana in Ziploc bags.  There was a brown sheath in the corner, but no sword, knife or machete that it could have encased.  On the coffee table the officers found marijuana residue, Zigzag papers, and a glass pipe.

Blood splatter was found on the walls, ceiling, and barbells; blood was also smeared on the wall.  A baseball bat was on the carpet just inches above Bond's head, and a Farberware knife handle was next to his body; the blade was missing.

Bond's feet were tied with a rope, and several of his teeth were knocked out.  There was an "[e]xtraordinary amount of injury [to] the body," including five stab wounds to Bond's torso.  A piece of wood was lodged in Bond's head above the hairline.  Numerous wood splinters and shards were located at the scene.  A trigger mechanism broken from the stock of a Marlin firearm, as well as metallic pieces from the weapon, were also found.

The forensic pathologist testified that Bond had both blunt force injuries—contusions, abrasions, and lacerations—and sharp force injuries—single-edge stab wounds and incisions—distributed over a large portion of his face and body.  He also had chop wounds, inflicted by a heavy sharp object such as a machete or axe.  A chop wound will cause a clean division of tissue but can also fracture bone underneath.  The cause of death was blunt force head injuries.  The killing blow was one crushing blow to the skull, imposed after the other injuries had been inflicted.

The pathologist concluded that either someone handled two weapons at the same time, or there was more than one assailant.  This opinion was based on the fact that all the injuries were delivered in the space of a few minutes, over many different areas of the body with different types of force involved, and an overlap between two kinds of force; at least a knife and a blunt force object was involved, if not two or three different blunt force objects.

## D. *Actions of Appellant and Freeland*

Freeland lived with his mother and stepfather, about a 15-minute walk from Bond's apartment.  Several days before the murder, Saleh was walking with Lucas Valtenbergs and Freeman after leaving Bond's apartment.  Freeland told her that he had shown nothing but love for Bond, but "all he had done is shit on him."  Valtenbergs mentioned that Freeman said he felt left out or not accepted by Bond.

Freeland's mother, Christine Scarioni, saw Freeland and appellant at her home on December 18, 2003, at around 9:00 p.m.  Ferlun Scarioni saw his stepson and appellant at the house the next morning.  They left around 8:00 or 9:00 a.m. Mrs. Scarioni saw appellant and another person who she assumed was her son get into a white truck and leave.

At around 11:00 a.m. Freeland came into his mother's room asking for cigarettes.  It looked like he just got out of the shower.  She brought cigarettes to his room; appellant was there sitting in a chair.

Freeland and appellant left.  Appellant was wearing Freeland's black shirt and beige Dickies.  Mrs. Scarioni went into Freeland's bathroom.  She picked up two T-shirts that did not belong to her son, some socks, and a pair of pants.  There was a pair of shoes in the bathtub that were not her son's.

The police arrived at the Scarioni residence around 3:50 p.m.  In the kitchen the police found a large Farberware kitchen knife, which matched the knife handle found at the scene.  In the bathroom was a wet pair of black Ben Davies pants on the vanity, several pairs of dirty white socks, and a white T-shirt with a brown stain on the floor, and a pair of black and red Converse shoes soaking in the bathtub.  Appellant admitted that the Ben Davies pants were his.  A ring that belonged to Bond was inside the pants pocket.

In Freeland's room the word "Norte" was written on the dresser.  Mrs. Scarioni said that the writing had been there less than a month.  The police also found a pair of wet black leather gloves; there was a trace of blood on the back middle finger of the left glove.  The DNA profile indicated Bond's blood was a major contributor and Freeland a possible minor contributor.  A shirt in the bedroom had appellant's blood on it.

A right-hand motorcycle glove cover was located at the Scarioni residence.  What appeared as the matching left-hand glove cover was on the floorboard of the pickup truck belonging to appellant's grandfather, which appellant had borrowed.  The police also searched appellant's house.  Norteno graffiti appeared on a mirror.

**E.  *Arrests***

Late in the evening on December 19, 2003, Deputy Gelhaus arrested appellant on an unrelated matter.  There was a silver metal watch in his jacket pocket.  The watch appeared similar to the one Bond wore.  At the time of arrest he had a scratch from his right earlobe across his cheek, and scratches on his arm.  Appellant had fresh dots on his face—one on one side, four on the other.

Mrs. Scarioni identified appellant as the person who was with Freeland earlier that day.  She identified the clothing appellant was wearing as belonging to her son.  The initials "J.F." were inside the waistband of the pants appellant was wearing.

Freeland was arrested the next day.  He had a small cut on his left hand, and scratches on his legs, chin, and ear.

**F.  *Gang Experts***

Anthony Souza was a gang officer for the California Highway Patrol before he retired.  Based on their tattoos and "the graffiti," he believed appellant and Freeland were active

4

members of the Nortenos, a criminal street gang as defined by Penal Code section 186.22.

Souza explained that "[r]espect is what they're all about." Thus, refusing to sell marijuana to a gang member on credit could be viewed as disrespectful to the member and his gang. Disrespect brings retaliation. A gang member who tolerates disrespect is considered weak. He would have to "make himself look good" or would be beaten up or worse. An onlooker who allowed another member to assault or rob without participating would also be regarded as weak.

A violent murder helps the "doer" by elevating his status within the gang. It also promotes the gang by instilling fear in the public.

Gangs also do home invasions of drug dealers' homes, taking guns, money, and drugs without fear that the victim might call the police. Gang members might use torture to make the victim divulge where the "stuff" is.

Souza expressed his opinion that "this was a gang case," based on a number of factors: the perpetrators were gang members, there was torture, Freeland felt he had been "shit on," plus it was a home invasion robbery of a drug dealer.

Detective George Collord of the Santa Rosa Police Department worked in the gang investigations unit. He testified that residential robberies are one of the "main stays" of the Norteno gang. Gang members learn how to extract information regarding the location of drugs, guns, and money and are taught how to commit a home invasion residential robbery. A gang member who just stands by and does not take an active part in a robbery will not be looked upon favorably.

It was Collord's opinion that appellant's four-dot tattoo announced that he was a Norteno, and he earned the right to have the tattoo through a "major amount of work." Further, Bond's murder was consistent with a residential robbery carried out by the Nortenos: Bond was a drug dealer, gang members committed the robbery and murder, and force was applied to elicit information. However, nothing about the mechanics of the crime itself made it a gang crime.

Collord indicated that there is a strict rule that a gang member in custody does not discuss his crime other than to say the code section of the charge. It is a "household polic[y]" not to brag about the crime because "that's a good way to end up with evidence against you." It would be unusual for appellant to tell people in jail that he killed someone.

Gang-related drawings were found in appellant's cell while he was in custody and on mail that was searched.

**G.** *Custodial Interview*

Detective Vance Eaton interviewed appellant on December 20, 2003.  A CD of the interview was played for the jury.  After receiving advisements pursuant to Miranda v. Arizona (1966) 384 U.S. 436 (Miranda), Eaton said he wanted to ask appellant about what happened in Windsor with him and "Josh."  Appellant said he had not been in Windsor that day and had done nothing.  He had been "walking everywhere" in Santa Rosa.  He called his grandmother from Santa Rosa and told her he left his grandfather's truck in town because he ran out of gas.  Appellant said he did not know anyone named "Josh."

When asked if he was high "right now," appellant replied "No."  He was "coming down" off crank.

Eaton told appellant there had been a homicide that day.  Appellant asserted: "Alls I have to say is I didn't do anything."  Eaton showed appellant a photograph of Freeland.  Appellant said he never saw him before.  "I do not hang out with white people like that . . . .  'Cause I hang out with other Mexicans."  He insisted that the clothes he was wearing were his.  Appellant claimed Norteno.  He said the tattoos on his face made him look "like a little gang-banger," which made him "the perfect person to blame for it."

**H.** *Recorded Statements to Family Members and Freeland*

After being charged with murder, appellant talked with his mother and grandfather.  The conversations were recorded and played for the jury.  Appellant told his mother he was charged with murder and was "probably gonna do a good twenty-five to thirty years."  His mother indicated the facts might prove differently.  Appellant replied: "Nahh, I do know.  I . . . ."  Regarding Freeland, appellant said: "Yeah and he fuckin' snitched on me and said it was all me."  And further: "They already had him before they got me.  And that's why they knew it was me 'cause they, he fuckin', he fuckin' said that I did it."  Appellant also said he would have taken off had he been released.  Appellant told his grandfather he was in on a murder charge, and "[H]e's tryin' to put everything on me."  Further, "I didn't even go out that, that day thinkin' anything would happen . . . .  It just did.  And I have to deal with it.  Possibly, I may never see the streets again."

A recording of appellant's January 15, 2004 jail conversation with Freeland was also played to the jury.  Appellant warned Freeland that they were put next to one another in hopes they would say something, and their cells might be bugged.  Freeland told him that his mother identified appellant's clothing for the police.  Appellant also stated: "But someone is snitching, all right?  I'll tell you that right now because the cops told, sat me down and told me everything that happened.  Everything.  And that's why I was like, 'What the fuck.  How does he know this shit?'"  Appellant said the police told him Freeland was trying to "put it all on" him; Freeland

said the police were saying the same thing to him.

Additionally, appellant said that they went there "for some weed" and "to buy dank from him . . . .  The most I'm guilty for is buying marijuana."  He didn't tell the police about buying weed "'cause I was afraid to."  After they referred to what the papers were reporting about the crime, appellant commented: "Whoever really did do that is a straight savage though . . . .  Alls I know is I didn't do shit man.  I went there to buy some dank weed."

Appellant also mentioned that the police showed him a ring they found in Freeland's room that belonged to Bond, and asked where Freeland got it.  Freeland reported that appellant's shoes did not have blood on them.  Appellant responded: "Cause we didn't do nothing to get blood on 'em."  About the scratches on his arms, appellant mentioned they "were from a cat, ah.  My mom's cat.  I picked it up and threw it right?"

Additionally, appellant expressed concern that a jury would think he was "a fuckin' criminal" because of his tattoos and "this big ass record of violent shit."

Appellant protested: "Naw, I'm innocent even if I, if they start to say I am guilty, fuck that.  For a 187 you need a witness and murder weapon."  Freeland reported that the police said "the knife handle . . . matches a . . . kitchen set to my house."  Appellant asked, "Was there a[ ] knife missing?"  When Freeland said there was, appellant responded: "[T]hat doesn't look good."  Freeland noted that "[t]hey didn't find no blade."  Appellant grunted, "Damn!"

Freeland also mentioned that the police said they found gloves with blood on them.  Appellant reacted: "What?!  [¶] . . . [¶]  That's impossible.  Bloody gloves at the house, um, no."  There were no witnesses to place them at the scene because they did not kill Bond.  They were there that morning and bought some weed.  Everything was fine when they were there.

**I.  *Appellant's Conversation with Carl Trumble***

Carl Trumble was in custody with appellant between December 19 and December 31, 2003, on convictions for possession of stolen property, felony transportation of methamphetamine, and misdemeanor driving under the influence.  In less than two weeks he was to enter an inpatient program.  At the time of trial Trumble was in custody for violation of probation, and was facing prison.  In exchange for his trial testimony, the district attorney offered Trumble a six-month county jail term and to keep him out of prison.  Trumble stated he would not have testified without the deal because he had misgivings about his safety in prison after testifying "against a Norteno."

Appellant confided to Trumble that he was being held on murder charges, and that he and a younger buddy robbed and

killed a pot dealer in Windsor.  Appellant said they "pummel[ed]" the victim and hacked, hit or poked at his eyes, using a machete and gun butt.  He left with "two-eighths" of weed and a little bit of jewelry.

Trumble told a correctional officer at the facility that appellant bragged that he and a friend beat someone up with a shotgun, stabbed his eyes and body with a machete, and "ended up killing" him.  Appellant said he took the shotgun from the victim.  Trumble was disgusted and upset.  Trumble did not ask for anything in return for the information.

On December 31, 2003, Trumble related his conversation with appellant to Detective Eaton.  Trumble had less than two weeks before he was to enter an inpatient program.  The detective did not make any promises or offer any deals in exchange for the information.  Trumble told Eaton that appellant stated that the victim had pulled a gun or shotgun on him and his friend, but they managed to get the gun away and beat him with it, and at one point poked the victim in the eyes with a machete.  Eaton asked Trumble if he had read newspaper accounts about the case.  Trumble first said he had not.  Throughout the conversation he referenced that he read about the Windsor murder and also mentioned an article that reported the age of one the suspects as seventeen.  However, he had not read the paper on the day of the interview.  Newspaper articles reporting on the murder, taken into evidence, did not mention a machete, poking an eye, using a gun butt, or theft of jewelry.

## J.  *Appellant's Trial Testimony*

Appellant lived in Healdsburg with his grandparents and mother.  He left school when he was 14 years old.  He was unemployed, and would borrow or sell drugs to purchase methamphetamine.

Appellant belonged to a Norteno street gang since he was about 11 years old.  It was the "in crowd at that time."  He considered himself part Hispanic.  As a gang member he got into fights, did drugs, and got drunk.  Other than fighting, he did not "get into it" with an enemy gang.  He did not deal with bosses, take orders or receive training.  Around December 18 and 19, 2003, appellant made the dots under his left eye "bigger" because he wanted to be recognized as a gang member.

Appellant testified that he first met Freeland on December 18, 2003, at his friend Gabe's house in Windsor, although he had seen him around a few times.  They went to Freeland's house, smoked methamphetamine and hung out.  Later, Freeland wanted to buy marijuana.  They went to Bond's apartment in appellant's truck.  This was his first visit to the apartment.  Freeland mentioned that Bond might not sell him marijuana because he owed $10.  While appellant waited in the truck, Freeland knocked on the window but was not let in.  They returned to Freeland's house.

The two went back to Bond's apartment as the sun was coming up. Freeland was wearing motorcycle-type gloves; appellant was not wearing gloves. Bond told Freeland to stop waking them up. This was the first time appellant met Bond. Bond said Freeland had to pay what he owed before he bought more. While waiting, appellant picked up a baseball bat leaning against the door. Appellant saw a sword in its sheath leaning against the couch; he did not touch it.

They returned to Freeland's house. His clothes were wet from the rain, so he borrowed clothes from Freeland, left his there and asked Freeland to put them in the dryer for him. Appellant left and went to his friend Israel's house. Around 10:00 or 11:00 a.m., he returned for his clothes. Freeland told him to come upstairs. There was a chair in Freeland's room with "a bunch of stuff on it," including gloves. Freeland was "real nervous" and said he "fucked up," confiding that he just participated in the beating death of Darin Bond. Freeland said that after appellant left, people went to Bond's apartment "to trade a gun for some weed." Bond took the gun and told Freeland he wanted the money "or you're not getting this back." They fought and "beat the shit out of him." Freeland believed Bond might be dead.

Freeland said he needed to get rid of his clothes because there was blood on them. Appellant saw blood on a jacket and shirt. Freeland also needed money for gas and wanted a ride to San Francisco. Freeland showered.

Appellant agreed to help Freeland because they belonged to the same gang. He put Freeland's clothes in a garbage bag and threw it over a fence near the railroad tracks. There was a trash can in Freeland's room with a knife, papers, and some socks. He dumped the can in a bin by the house.

Freeland gave appellant a watch, asking him to trade it for dope and maybe money for gas to get to San Francisco. Appellant put it in his pocket; he assumed it was Freeland's. Appellant did not recall receiving a ring or putting it in his pants, and did not know how it got there. Appellant identified the pants that he left at Freeland's house.

After appellant dumped the clothing he drove to Healdsburg. He was supposed to meet Freeland again, but appellant decided not to. The truck was low on gas so he parked in a Safeway lot and bussed to Santa Rosa to make an "SOR appointment." He called his grandparents to let them know where the truck was and said he probably would not be home that night.

Appellant lied to Detective Eaton because he and Freeland agreed that if questioned, they would "deny knowing each other, deny being at his house." He did not want to be involved, and did not want to be a snitch or rat.

> Appellant acknowledged speaking with Trumble about the crime when he was in jail . . . , but did not admit that he killed anyone or used a gun or machete.  Trumble had seen a newspaper article and asked appellant about it.  Appellant said he was "kind of involved in it, but didn't actually do it."
>
> Appellant explained that he got scratched on his arms when he picked up his mother's cat.  The glove in his grandfather's car was not his.

People v. Powers, No. A119997, 2009 WL 2602641, *1-8 (Cal. Ct. App. Aug. 25, 2009) (footnotes omitted).

## B.   CASE HISTORY

### 1.   Conviction and Sentencing

On December 22, 2006, a Sonoma County jury convicted petitioner of first degree murder (Cal. Penal Code § 187(a); count 1), burglary (id. § 459; count 2), and first degree robbery (id. § 211; count 3).  4CT 676-680.

As to count 1, the jury found true the special circumstance allegations of burglary (id. § 190.2(a)(17)(A)), robbery (id. § 190.2(a)(17)(G)), and torture (id. § 190.2(a)(18)), but found not true the street gang special circumstance allegation (id. § 190.2(a)(22)).  As to counts 1 and 2, the jury found a criminal street gang enhancement to be true (id. § 186.22(b)(1)).  4CT 676-680.

On November 8, 2007, the trial court sentenced Petitioner to life in prison without the possibility of parole.  5CT 995-996.

### 2.   Appeals

Petitioner appealed the judgment to the California Court of Appeal.  5CT 999.  On August 25, 2009, in an unpublished opinion, the California Court of Appeal affirmed the judgment.  Resp't Ex. F.

Petitioner filed a timely petition for review in the California Supreme Court.  Resp't Ex. G.  The state supreme court denied review on December 17, 2009.  Resp't Ex. H.

### 3.   Federal Court Proceedings

On January 26, 2010, Petitioner filed the instant Petition, which alleged the claims raised in his petition for review.  Dkt. 1.  On July 13, 2010, the Court issued an amended

1  Order to Show Cause why the writ should not be granted.  Dkt. 5.  On November 18, 2010,

2  Respondent filed an Answer to the Petition.  Dkt. 15.

3       On January 10, 2011, the Court issued an Order granting Petitioner's request for a

4  stay of proceedings while he returned to state court to exhaust two new grounds.  Dkt. 18.

5  Thereafter, Petitioner filed his Traverse, in which he informed the Court that he requested

6  to "dismiss moving forward on the[] separate grounds."  Dkt. 20 at 7.

7       On June 2, 2014, upon construing Petitioner's request as a motion to reopen the

8  action, lift the stay, and move forward on his original exhausted claims, the Court granted

9  his motion.  Dkt. 25 at 1.

10      The matter is fully briefed and ripe for adjudication.

11 **II.    LEGAL STANDARD**

12      **A.    28 U.S.C. § 2254(D)(1)**

13      The instant petition is governed by the Antiterrorism and Effective Death Penalty

14 Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  Under AEDPA, a federal court cannot grant

15 habeas relief with respect to any claim adjudicated on the merits in a state-court proceeding

16 unless the proceeding "resulted in a decision that was contrary to, or involved an

17 unreasonable application of, clearly established Federal law, as determined by the Supreme

18 Court of the United States."  28 U.S.C. § 2254(d)(1).

19      A state court decision is "contrary to" clearly established federal law "if the state

20 court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or

21 if the state court confronts a set of facts that are materially indistinguishable from a

22 decision of [the Supreme] Court and nevertheless arrives at a result different from [its]

23 precedent."  Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (internal quotation marks

24 omitted).

25      On federal habeas review, AEDPA "imposes a highly deferential standard for

26 evaluating state-court rulings" and "demands that state-court decisions be given the benefit

27 of the doubt."  Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).

28 In applying the above standards on habeas review, this Court reviews the "last reasoned

decision" by the state court.  See Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).
The last reasoned decision in this case is the Court of Appeal's unpublished disposition
issued on August 25, 2009.

**B.    28 U.S.C. § 2254(D)(2) AND (E)(1)**

A federal habeas court may grant a writ if it concludes a state court's adjudication of
a claim "resulted in a decision that was based on an unreasonable determination of the facts
in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).
An unreasonable determination of the facts occurs where a state court fails to consider and
weigh highly probative, relevant evidence, central to a petitioner's claim, that was properly
presented and made part of the state court record.  Taylor v. Maddox, 366 F.3d 992, 1005
(9th Cir. 2004).  A district court must presume correct any determination of a factual issue
made by a state court unless a petitioner rebuts the presumption of correctness by clear and
convincing evidence.  28 U.S.C. § 2254(e)(1).  The presumption of correctness applies to
express and implied findings of fact by both trial and appellate courts.  Sumner v. Mata,
449 U.S. 539, 546-547 (1981); see Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir.
2004) ("On habeas review, state appellate court findings—including those that interpret
unclear or ambiguous trial court ruling—are entitled to the same presumption of correctness
that we afford trial court findings.").

Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding
process, or situations in which the petitioner challenges a state court's fact-findings based
entirely on the state court record, whereas § 2254(e)(1) applies to challenges based on
extrinsic evidence, or evidence presented for the first time in federal court.  See Taylor, 366
F.3d at 999-1000.  In Taylor, the Ninth Circuit established a two-part analysis under
§§ 2254(d)(2) and 2254(e)(1).  Id.  First, federal courts must undertake an "intrinsic
review" of a state court's fact-finding process under the "unreasonable determination"
clause of § 2254(d)(2).  Id. at 1000.  The intrinsic review requires federal courts to examine
the state court's fact-finding process, not its findings.  Id.  Once a state court's fact-finding
process survives this intrinsic review, the second part of the analysis begins by addressing

the state court finding of a presumption of correctness under § 2254(e)(1).  Id.  According to the AEDPA, this presumption means that the state court's fact-finding may be overturned based on new evidence presented by a petitioner for the first time in federal court only if such new evidence amounts to clear and convincing proof a state court finding is in error.  See 28 U.S.C. § 2254(e)(1).  "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)."  Taylor, 366 F.3d at 1000.

If constitutional error is found, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

## III.   **DISCUSSION**

Petitioner asserts the following claims:

(1) the trial court erred in admitting his statements to police because (a) the absence of a valid Miranda[2] waiver violated his Fifth Amendment rights and (b) he invoked his Fifth Amendment right to remain silent, but police questioning improperly continued;

(2) his trial testimony was a product of the aforementioned Fifth Amendment violations;

(3) the prosecutor committed misconduct by playing an unredacted copy of a taped conversation between Petitioner and his family; and

(4) the trial court erred in denying his motion for a new trial based on his claim of ineffective assistance of counsel ("IAC") for trial counsel's failure to retain an investigator or locate a witness.  Dkt. 1 at 18.[3]

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

[3] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by Petitioner.

**A.   MIRANDA CLAIMS**

**1.   Background**

On November 20, 2006, the defense filed an in limine motion, seeking an order that the prosecution be prevented from offering into evidence any of Petitioner's statements to police "unless and until a hearing is held outside the presence of a jury to determine its admissibility." 3CT 447.  The defense relied on the Fifth Amendment and <u>Miranda</u> as the basis for the motion. 3CT 447-449.   The trial court held a hearing on the defense's in limine motion on November 29, 2006.  7RT 982-999.

The state appellate court recited the following background facts relating to the hearing and Petitioner's custodial interview which took place on December 20, 2003:

> At the hearing on appellant's in limine motion concerning the admissibility issue, a tape of Detective Eaton's custodial interrogation was played for the court and Detective Eaton testified.  He stated that prior to the interview he did not mistreat appellant, or make any promises or threats.  He explained that before entering the interview room, he stopped to check appellant's demeanor.  Appellant was talking to himself.  Eaton noted his agitation.  He was moving excitedly.  Eaton was concerned that appellant might be under the influence of a controlled substance.  However, there was nothing in appellant's demeanor or otherwise that led Eaton to believe he was not an involved participant in the discussion.

> Eaton asked appellant if he understood his rights.  He replied in the affirmative.  Next, he inquired if appellant was willing to answer some questions.  Appellant replied, "tell me what they are."   Eaton explained that he did not understand this response as putting a condition on whether appellant was willing to answer questions.  Rather, appellant "made it clear he wanted to know what I wanted to ask of him so that makes the imperative on me to ask the first question."  Eaton believed appellant expressed "not only impatience, but an urgency to move forward with the interview."  At that point Eaton "felt that he was lucid, coherent and well in command of his faculties, so I jumped into the interview."  The following exchange took place after the admonitions and acknowledgments:

> "[Detective Vance Eaton ("VE")] Okay.  So . . . you understand those rights that I just explained to you.

> "[Andrew Powers ("AP")]          Yes.

> "VE    Okay.  Are you willin' to answer some questions?

14

1

"AP    On [sic], tell me what they are.

2

"VE    Okay.  Well . . . I don't want talk to you about the, the, the chain.  Okay?  ANDREW . . . you need to hear me out. [¶] . . . [¶] . . .

3

4

"AP    All right, I'm sorry.  Sorry.

5

"VE    All right.

6

"AP    I'm just crank, I mean, I mean . . .

7

"VE    Okay.

8

"AP    . . . forget it, man.

9

"VE    Why don't you take a few deep breaths while I talk . . .

10

"AP    Oh, I'm breathin' all right.

11

"VE    . . . and then, and then, and then I'll be quiet so you can talk.  All right?

12

"AP    All right.

13

"VE    Okay.  But I need to know that you're understanding and listening.

14

"AP    I am.

15

"VE    Okay.  I wanna talk to you about what happened up in Windsor today.  Okay?

16

"AP    I wasn't in Windsor today.

17

"VE    And I wanna find out from you, m'kay, what happened . . .

18

19

"AP    I don't know what you're . . .

20

"VE    . . . with you . . .

21

"AP    . . . talking about.

22

"VE    . . . with you and JOSH.

23

"AP    I don't know nobody named JOSH.

24

"VE    'Kay. Well  . . .

25

"AP    What, what the fuck, ma . . . man, this is . . .

26

"VE    Okay. You're, uh . . .

27

28

"AP    . . . oh man, this is weird, man, I don't like this, man, I'm bein' fuckin' set up by some tweaked out somebody, some

broad, I don't know.  Somebody did somethin' wrong and they're, I know, man, you know what I'm talkin' about.  These motherfuckers do this shit.  And, uh . . .

"VE    Hey, ANDREW.

"AP    . . . Goddamn, I don't wanna go through this, man.  Take me to jury trial, I didn't fuckin' do anything.  I don't even want hear it, man . . .

"VE    Hey, ANDREW.

"AP    . . . I, I don't wanna hear it.

"VE    Would you entertain the possibility, . .

"AP    Seriously, I don't wanna hear it, man . . .

"VE    . . . that you . . .

"AP    . . . you're gonna stress me out, man.

"VE    . . . that, that you did, that you did nothing wrong?  Okay?

"AP    Yes, man . . .

"VE    And that you're in the wrong place at the wrong time?  Would you entertain that possibility?

"AP    Nope.  No, I, no, because I haven't fuckin' (inaudible . . .) . . .

"VE    So [if], if you haven't been in Windsor today, then you won't have a problem tellin' me where you were today so we can verify that.

"AP    I told you where I was, man, I was in Santa Rosa, man.

"VE    'Kay.  Where were you at in Santa Rosa?

"AP    Walking everywhere, man, I've seen you, man, I knew somethin' weird was goin' on, I just had a feeling all day. . . ."

The trial court pointed out that appellant never stopped the course of the questioning, but rather kept "going into it." The court concluded that "at the very least there is implied consent," and further noted that appellant knew how to express himself when he wanted to, because later he asked for a lawyer and the questioning stopped.

Powers, 2009 WL 2602641, *8-9.  Specifically, the trial court found that Petitioner's

statements to Detective Eaton were admissible because Petitioner gave an implied waiver

16

of his <u>Miranda</u> rights, specifically, "a clear . . . implied waiver of his right to remain silent." 7RT 999.

### 2.   Applicable Law

#### a)   *<u>Miranda</u> Waiver*

In <u>Miranda</u>, the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted into evidence. <u>Miranda</u> and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal courts.  384 U.S. at 443-45.  The requirements of <u>Miranda</u> are "clearly established" federal law for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d).  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1271 (9th Cir. 2005).

Once properly advised of his rights, an accused may waive them voluntarily, knowingly and intelligently.  <u>Miranda</u>, 384 U.S. at 475.  Where a <u>Miranda</u> waiver is concerned, the voluntariness prong and the knowing and intelligent prong are two separate inquiries.  <u>Derrick v. Peterson</u>, 924 F.2d 813, 820-24 (9th Cir. 1990) (explaining waiver analysis in detail), <u>overruled on other grounds by</u> <u>United States v. Preston</u>, 751 F.3d 1008 (9th Cir. 2014) (en banc).  The voluntariness component turns on the absence of police overreaching, i.e., external factors, whereas the cognitive component depends upon the defendant's mental capacity.  <u>Id.</u>  Although courts often merge the two-pronged analysis, the components should not be conflated.  <u>Id.</u>

A valid waiver of <u>Miranda</u> rights depends upon the totality of the circumstances, including the background, experience and conduct of the defendant.  <u>See</u> <u>United States v. Bernard S.</u>, 795 F.2d 749, 751 (9th Cir. 1986).  The waiver need not be express as long as the totality of the circumstances indicates that the waiver was knowing and voluntary. <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979); <u>Juan H.</u>, 408 F.3d at 1271.  There is a presumption against waiver.  <u>United States v. Garibay</u>, 143 F.3d 534, 536 (9th Cir. 1998). The government has the burden to prove waiver by a preponderance of the evidence. <u>Colorado v. Connelly</u>, 479 U.S. 157, 168-69 (1986).  To satisfy its burden, the government must introduce sufficient evidence to establish that under the totality of the circumstances,

1  the defendant was aware of "the nature of the right being abandoned and the consequences

2  of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986).

3      "Where the prosecution shows that a Miranda warning was given and that it was

4  understood by the accused, an accused's uncoerced statement establishes an implied waiver

5  of the right to remain silent." Berghuis v. Thompkins, 560 U.S. 370, 384 (2010).  The law

6  presumes that an individual who fully understands their rights and acts in a manner

7  inconsistent with them has made "a deliberate choice to relinquish the protection those

8  rights afford." Id. at 385.  A showing that the defendant knew his rights generally is

9  sufficient to establish that he knowingly and intelligently waived them. See id.

10             *b)*    ***Invocation of Fifth Amendment Right to Remain Silent***

11      If a suspect indicates in any manner during questioning that he wishes to remain

12  silent, interrogation must cease and any statement obtained thereafter is considered the

13  product of compulsion. Miranda, 384 U.S. at 473-74.  A suspect who wishes to invoke the

14  right to remain silent must do so unambiguously. Berghuis v. Thompkins, 130 S. Ct. 2250,

15  2260 (2010).  "A requirement of an unambiguous invocation of Miranda rights results in an

16  objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers'

17  on how to proceed in the face of ambiguity." Id. (quoting Davis v. United States, 512 U.S.

18  452, 458-59 (1994)).  A suspect who "did not say that he wanted to remain silent or that he

19  did not want to talk with the police" has not invoked his right to remain silent. Id. at 2260.

20  A state court's application of the Davis "clear statement" rule to the invocation of the right

21  to remain silent is not contrary to or an unreasonable application of Supreme Court

22  precedent for purposes of § 2254(d). DeWeaver v. Runnels, 556 F.3d 995, 1002 (9th Cir.

23  2009).

24      **3.    Analysis**

25      Prior to the December 20, 2003 custodial interview, Detective Eaton read Petitioner

26  his Miranda rights.  7RT 992-993; 3SCT 1588-1590.  Detective Eaton also asked Petitioner

27  whether he understood his rights, to which he answered affirmatively.  7RT 992-993; 3SCT

28  1588-1590.  Petitioner does not allege any language or communication difficulties.  As

18

1    mentioned above, a Miranda waiver need not be express in order to be effective. Butler,

2    441 U.S. at 373. Nonetheless, Petitioner maintains that his statements to police made after

3    receiving his Miranda advisements were inadmissible. First, Petitioner contends that in

4    making the above-described statements to police, his Miranda waiver was not knowing,

5    intelligent and voluntary. Dkt. 1 at 25-36. Second, Petitioner claims that his Fifth

6    Amendment right to remain silent was violated when Detective Eaton continued to question

7    him after he did not want to talk to him anymore. Id. at 37-39.

8        Petitioner's Miranda claims rest on the contention that the state court's factual

9    findings were contrary to the record. Petitioner argues that he did not provide an express

10   waiver and that his actions did not amount to an implied waiver of his Miranda rights. Id.

11   at 35. Petitioner premises his argument on the grounds that he did not want to continue

12   with the interrogation once he learned the "subject of the questions," but that "the detective

13   steamrolled ahead with the interrogation." Id. With regard to the invocation of his right to

14   remain silent, Petitioner states that his statements showed that "he did not want to be

15   interviewed . . . and instead wanted to go "'to a jury trial'; [because] Petitioner stated at

16   least three times that '[h]e did not want to hear it' (i.e., the questions by the detective), yet

17   the detective persisted in the questioning." Dkt. 20 at 1. By arguing that the trial court

18   erred in ruling that his statements to police were admissible, Dkt. 1 at 39, Petitioner also, in

19   essence, argues that he was denied a full and fair hearing on his in limine motion regarding

20   the Miranda issues.

21       The state appellate court rejected Petitioner's first claim that he did not provide a

22   knowingly, intelligently or voluntarily waiver his Miranda rights, stating:

23
24           The totality of circumstances of Detective Eaton's
             interrogation of appellant supports the trial court's finding that
25           appellant knowingly and intelligently made an implied waiver
             of his Miranda rights. First, although Eaton expressed some
26           suspicion that appellant might have been under the influence of
             drugs, he testified that appellant was coherent and an involved
27           participant in the conversation. Our review of the record
             supports the conclusion that appellant was lucid and coherent in
28           that he was able to follow the questioning in a responsive

19

manner.  Additionally, Eaton took off appellant's handcuffs at the beginning of the interview and left them off throughout.

Second, when Eaton asked appellant if he was willing to answer some questions, appellant said "tell me what they are." Eaton reasonably interpreted appellant's response as impliedly waiving his Miranda rights, and expressing a willingness to go forward.  Thus, he began the interview.

The tone of the interview itself was cordial, with no threats or promises or heavy-handedness.  Moreover, the record is devoid of any suggestion that Detective Eaton resorted to physical or psychological pressure to prompt responses from appellant.  In short, he was not worn down by improper interrogation techniques, trickery, etc.  (People v. Cruz, supra, 44 Cal. 4th at p. 669.)

As well, there is nothing in the record suggesting that appellant did not understand his legal rights.  After Eaton explained the Miranda rights to appellant, he asked if appellant understood those rights.  Appellant said he did.  Eaton also told appellant he needed to know that appellant was understanding and listening.  Again, appellant said he was.  And, as the trial court noted, appellant showed he understood and knew how to exert his rights later on in the interview when he said he "wanna lawyer, man."  Eaton shut down the interview at that point.

Appellant highlights the three times he said he did not "wanna hear it."  These statements, occurring very close in time and interspersed with nothing threatening by Detective Eaton, were made after appellant began answering the questions he gave Eaton permission to lay out.  Thereafter, he continued to willingly participate in the interview.  Under the totality of the circumstances, we agree with the trial court that appellant did not indicate an unwillingness to waive his Miranda rights.

Powers, 2009 WL 2602641, *10-11.

Meanwhile, in rejecting Petitioner's second claim, the state appellate court drew guidance from Miranda and Davis, as well as from California case law on the applicable standard for determining whether a suspect has invoked the right to remain silent.  Powers, 2009 WL 2602641, *11-12.  The state appellate court also cited a number of cases, in which the defendant's statement did not amount to an invocation of Miranda rights:

. . . (1) <u>People v. Davis</u> (1981) 29 Cal. 3d 814, 823-824 (defendant's single statement during polygraph that he did not want to answer a question); (2) <u>People v. Jennings</u> (1988) 46 Cal. 3d 963, 977-978 (after assailing the questioning police officer, the defendant's statement that "'"I'm not going to talk". . . "That's it.  I shut up,"'" was but an expression of "'momentary frustration and animosity'" toward the officer); (3) <u>In re Joe R.</u> (1980) 27 Cal. 3d 496, 516 (taken in context, the defendant's statement, "'"That's all I got to say"'" or "'"That's all I want to tell you"'"); and (4) <u>People v. Silva</u> (1988) 45 Cal. 3d 604, 629 (defendant's statement, "'"I really don't want to talk about that"'").

<u>Id.</u> at *12.  Applying this law to Petitioner's claim, the state appellate court concluded that Petitioner did not invoke his Fifth Amendment privilege, finding as follows:

> Construed in context, appellant's remarks did not amount to an unambiguous summoning of the right to remain silent.  Instead, the "I don't wanna hear it," "I don't wanna go through this" and "take me to jury trial" remarks are more reasonably construed as an expression of appellant's disbelief and frustration that he had been implicated as a suspect in the Windsor incident.  Further, the record as a whole does not suggest that appellant wanted to stop the interview until he asked for a lawyer.  He continued to participate and express himself without hiatus.

<u>Powers</u>, 2009 WL 2602641, *12.

As noted, where the state court's factual findings are at issue in a habeas proceeding, the district court must first conduct an "intrinsic review" of its fact-finding process.  <u>See</u> <u>Taylor</u>, 366 F.3d at 999-1000.  "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003); <u>see also</u> <u>Cavazos v. Smith</u>, — U.S. —, 132 S. Ct. 2, 4 (2011) (per curiam) (it is not the province of the district court on federal habeas review to reassess issues of credibility or to reweigh the evidence).  Here, the trial court conducted an evidentiary hearing on the defense's in limine motion.  The state appellate court affirmed the trial court's ruling in a reasoned decision.  The record demonstrates that Petitioner had a full, fair and complete opportunity to present evidence in support of his claim to the state courts, of which he took full advantage.  Accordingly, the Court finds that

1   the state court's fact-finding process survives intrinsic review.  See Hibbler v. Benedetti,

2   693 F.3d 1140, 1146 (9th Cir. 2012) (noting that "a federal court may not second-guess a

3   state court's fact-finding process unless, after review of the state-court record, it determines

4   that the state court was not merely wrong, but actually unreasonable") (quoting Taylor, 366

5   F.3d at 999).

6        "Once the state court's fact-finding process survives this intrinsic review . . . the

7   state court's findings are dressed in a presumption of correctness. . . ." Taylor, 366 F.3d at

8   1000.  "AEDPA spells out what this presumption means:  State-court fact-finding may be

9   overturned based on new evidence presented for the first time in federal court only if such

10  new evidence amounts to clear and convincing proof that the state-court finding is in error."

11  Id. (citing 28 U.S.C. § 2254(e)(1)).   Here, Petitioner fails to present clear and convincing

12  evidence sufficient to overcome the presumption of correctness of the state court's factual

13  findings.  The record shows that Petitioner was read his Miranda rights, and upon being

14  asked whether he understood those rights, he stated that he did, and then he agreed to speak

15  with Detective Eaton.  3SCT 1588-1590.  Such a showing, in the absence of circumstances

16  suggesting a contrary finding, is sufficient to establish Petitioner knew his rights and

17  waived them knowingly and intelligently.  See Paulino v. Castro, 371 F.3d 1083, 1086-87

18  (9th Cir. 2004) (holding statement by suspect that he understood his rights and wanted to

19  talk to officer sufficient to show waiver of Miranda rights).

20        Petitioner contends his waiver was not knowing and intelligent because he allegedly

21  did not want to participate after he realized what the interview was about.  As noted, there

22  is no factual basis in the state court record to support Petitioner's contention.  Furthermore,

23  his assertions—that he did not waive his Miranda rights and that he invoked his right to

24  remain silent—were rejected by the trial judge who listened to the taped interview, read the

25  interview transcript, and took witness testimony.  Those determinations were affirmed by

26  the state appellate court that reviewed the record, including transcripts of the interview.

27  Moreover, where a petitioner disagrees with a state appellate court's interpretation of the

28  record, the appellate court's factual determinations will not be found unreasonable if its

depiction of the trial record is accurate and the petitioner cannot point to any material fact that the court failed to consider.  DeWeaver, 556 F.3d at 1006-07.  Although Petitioner disagrees with the factual determinations made by the state courts, he points to no material fact that any court failed to consider or to any inaccuracy in the state court record.  Id.  Therefore, the Court finds it appropriate to defer to the state court's findings, which are reasonable and therefore binding in these proceedings under § 2254(d)(2).  Taylor, 366 F.3d at 1000.

Furthermore, the state courts' findings that Petitioner's statements to Detective Eaton were voluntary constitutes a reasonable application of pertinent federal law within the meaning of § 2254(d)(1).  See, e.g., Pollard v. Galaza, 290 F.3d 1030, 1035-36 (9th Cir. 2002) (no coercion found in police questioning that violated Miranda because the defendant initiated the conversation by asking "What happened?," he showed no signs of physical discomfort, and the physical environment was not excessively uncomfortable).  After reasonably rejecting Petitioner's claim, the state courts found that the totality of the circumstances were sufficiently persuasive to show that his statements were voluntary.  The trial court denied the in limine motion based on that court's finding that, under the circumstances of this case, Petitioner impliedly waived his Miranda rights and "elect[ed] to carry on the conversation" with Detective Eaton.  7RT 999.  The state appellate court specifically noted that Petitioner was "not worn down by improper interrogation techniques" and that "[u]nder the totality of the circumstances," it agreed with the trial court that Petitioner's waiver was voluntary because he "did not indicate an unwillingness to waive his Miranda rights."  Powers, 2009 WL 2602641, *10-11.  The state courts' determination that Petitioner's statements were voluntary on the basis of an implied Miranda waiver must stand.  Similarly, the state courts' determination—that Petitioner's remarks did not amount to an unambiguous summoning of the right to remain silent—was also a reasonable application of the Davis "clear statement" rule for purposes of § 2254(d)(1).  DeWeaver, 556 F.3d at 1002 (no habeas relief available where state court had

1  concluded that suspect asking to be taken back to jail did not evidence a refusal to talk

2  further and was not an invocation of right to remain silent).

3       Even if the state appellate court erred, the erroneous admission of his statements to

4  police is subject to a harmless error analysis.  Arizona v. Fulminante, 499 U.S. 279, 306-12

5  (1991).  In other words, habeas relief is appropriate only if the coerced statements to police

6  had a "substantial and injurious effect or influence in determining the jury's verdict."

7  Brecht, 507 U.S. at 637.  In the present case, there was strong evidence of Petitioner's guilt:

8  Petitioner was implicated by a former cellmate, Carl Trumble, who testified at trial that

9  Petitioner admitted to the murder; the victim's DNA was in blood taken from gloves found

10 in Freeland's room (where Petitioner's clothing was also found); and the victim's watch

11 was found on Petitioner when he was arrested.  Thus, it cannot be said that the admission of

12 Petitioner's statements to police had a substantial or injurious effect on the verdict.

13      Based on the above, this Court finds that the state appellate court's rejection of

14 Petitioner's claims of improper admission of his statements to police was based on a

15 reasonable determination of the facts under § 2254(d)(2) and on a reasonable application of

16 clearly-established federal law under § 2254(d)(1).  Accordingly, Petitioner's claims on

17 both Miranda issues are DENIED.

18      **B.    TRIAL TESTIMONY WAS TAINTED PRODUCT OF STATEMENTS TO POLICE**

19      Petitioner asserts that his trial testimony was the tainted product of the Fifth

20 Amendment violations underlying his first two Miranda claims.  As a result, Petitioner

21 contends that Respondent cannot rely on his trial testimony to argue that the asserted Fifth

22 Amendment violations were not prejudicial.  Dkt. 1 at 40-41.  He further argues that the

23 trial testimony would be inadmissible if the case were to be retried.  Id. at 41.  The state

24 appellate court found it unnecessary to reach these contentions, based upon having found

25 that no underlying Fifth Amendment violation had occurred.  Powers, 2009 WL 2602641,

26 *15, note 5 ("Because we reject [Petitioner]'s Miranda arguments, we also reject the

27 contention that his trial testimony was the tainted product of his statements to the police.").

28 For the same reasons, this Court finds that Petitioner's claim need not be reached because it

1  has concluded above that no Fifth Amendment violation occurred.  Therefore, this claim is

2  DENIED.

3  **C.  PROSECUTORIAL MISCONDUCT CLAIM**

4  Petitioner claims the prosecutor engaged in misconduct by playing an unredacted

5  copy of a taped conversation between Petitioner and his family, which made a reference to

6  his "violent past."  Dkt. 1 at 42-44.  The state appellate court summarized the facts relevant

7  to this claim as follows:

8  
9  During motions in limine, defense counsel requested redaction of two references to his client's "prior criminality" that appeared in a taped conversation between appellant and members of his family.  The trial court listened to the tape.  The prosecutor had no objection to the redactions and the court ordered them.

10  
11  

12  When it came time to play the tape at trial, the redacted transcript was provided to the jury.  However, the prosecutor mistakenly started to play the unredacted tape for the jury and stopped after hearing the first reference to appellant's violent past when he realized he had the wrong tape.  The jury thus heard "the DA tried to start bringing up shit from my past" and "I'm fuckin violent and I need to be kept in jail and all this bullshit so the judge had to fuckin' (unintelligible)."  However, this language did not appear in the transcript given to the jury.

13  
14  
15  
16  

17  Defense counsel moved for a mistrial, making it clear that he was not impugning the prosecutor's integrity.  The trial court denied the motion.  The court's solution was to replay the correct tape from the beginning on the theory that if nothing were mentioned about the mixup, the jury may not be aware of it.  The tape had been played at the very end of the day, and the court believed "it probably got by, meaning without anyone picking [it] up."  Further, the prosecutor argued that the sound quality of the tape was poor and thus the jurors more likely followed the correctly redacted transcripts.  And, besides arguing that the redacted material was admissible evidence, the prosecutor additionally asserted that the reference to appellant's violent past was not prejudicial because the jury had heard appellant refer to his violent past in the taped conversation between appellant and Freeland.  And, the jury would also hear about his conviction for arson from appellant's conversation with Detective Eaton.

18  
19  
20  
21  
22  
23  
24  
25  

26  Powers, 2009 WL 2602641, *12.

27  In rejecting Petitioner's claim of prosecutorial misconduct, the state appellate court

28  stated:

25

Here, there is one criticized instance in which the prosecutor mistakenly played the wrong tape. One of two references to appellant's violent past, which should have been redacted, was played before the error was discovered. The jury had the correct, redacted transcript. The quality of the tape was poor. And in any event, evidence of appellant's violent criminal past was already properly before the jury through the recorded conversation between appellant and Freeland. Additionally, appellant's statement to Detective Eaton that he did five years for arson and counterfeiting was legitimately before the jury. This minor slip simply did not amount to a denial of due process. Nor was it deceptive or reprehensible behavior meriting the sanction of misconduct under state law.

Id. at *13.

Claims of prosecutorial misconduct are reviewed under the narrow standard of due process and not the broad exercise of supervisory power. Darden v. Wainwright, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Id.; Smith v. Phillips, 455 U.S. 209, 219 (1982). Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. See Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005). A prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995).

Petitioner's claim of prosecutorial misconduct is without merit. Although the prosecutor's actions of playing the unredacted portion of the tape were improper, Petitioner has not shown, as required by Darden, that such actions so infected the trial with unfairness as to make the resulting conviction a denial of due process. The quality of the unredacted tape was poor, and trial counsel as well as the trial court acted swiftly to correct the mistake and play the correct redacted tape from the beginning. Further, the jury heard other evidence of Petitioner's violent criminal past. Considering the weight of the other evidence tending to prove Petitioner's guilt, the Court cannot conclude that the prosecutor's actions, if improper, rendered Petitioner's trial fundamentally unfair.

1    Accordingly, the state appellate court's rejection of Petitioner's prosecutorial

2  misconduct claim is not contrary to, or an unreasonable application of, clearly-established

3  federal law.  See 28 U.S.C. § 2254(d)(1).  Therefore, this claim is DENIED.

4    **D.    CLAIM RELATING TO DENIAL OF MOTION FOR NEW TRIAL**

5    Petitioner asserts that the trial court erred in denying his motion for a new trial based

6  on his claim that his trial counsel was ineffective in failing to retain an investigator or

7  locate witnesses.  Dkt. 1 at 45-55.  The state appellate court provided the following

8  background as to this claim:

> F. Geoffrey Dunhan [sic] was appointed as defense
> counsel for appellant after his conviction.  Dunham filed a
> motion for new trial, submitting his own and appellant's
> declaration.  Dunham declared that trial counsel, Bernabe
> Hernandez, had been uncooperative and refused to discuss the
> case.  Further, he believed that Hernandez had been disciplined
> by the State Bar for misconduct of a similar nature, and was
> currently no longer eligible to practice law in this state.
> Appellant stated that he met with Hernandez approximately
> three times over three years.  The first meeting was no longer
> than 10 minutes and did not include the exchange of any
> significant information.  The next two meetings were longer but
> did not include the exchange of meaningful information.
> Hernandez never discussed the facts of the case or possible
> defenses with appellant.  Appellant did not believe Hernandez
> interviewed any potential witnesses, in particular Israel Garcia,
> who was with appellant at the time of the murder and could
> have provided a potential alibi.  Nor did appellant believe
> Hernandez used a court-appointed investigator.  Appellant
> never received copies of relevant reports, notwithstanding
> requests for the same.  Finally, Hernandez did not discuss
> appellant's prospective testimony with him.  It appeared to
> appellant that Hernandez was "distracted by outside
> considerations and did not seem to understand the facts of the
> case."
>
>     Countering this motion, the prosecutor submitted a
> declaration stating that the preliminary hearing transcripts
> showed that Hernandez actively cross-examined witnesses and
> was "clearly familiar with the crime reports."  As well, in
> preparing for the jury trial, the prosecutor had numerous

conversations with Hernandez regarding discovery, witness availability and evidence viewing issues.  They went over all the evidence items and photos.  Further, he made special arrangements to accommodate Hernandez with a "'contact visit'" with appellant before he testified.  During the two years after the preliminary hearing, appellant made many court appearances.  The prosecutor observed Hernandez and appellant communicate, and noted that they appeared to enjoy a collegial relationship.  Appellant never complained about his representation.  When the prosecutor asked appellant during cross-examination whether Israel would be able to say appellant was with him for 20 minutes sometime during the morning in question, appellant responded, "'I doubt he would remember. That's three years ago and I went over there every day.'" Finally, the prosecutor observed Hernandez in numerous felony jury trials and "noted that in this matter as he always did, Mr. Hernandez ably and competently represented Mr. Powers in an adversarial manner and never appeared distracted from the issues involved in this jury trial."

The trial court denied the motion on the papers submitted.  Appellant maintains that summary denial, with no effort to determine the validity of the assertions, was error.

Powers, 2009 WL 2602641, *13-14.

The state appellate court disagreed with Petitioner, and found that there was no abuse of discretion in the trial court's summary denial of the motion for new trial.  Id. at *14.  The court further ruled that defense counsel was not ineffective, stating as follows:

Our review of the trial record does not support the assertion that Hernandez was inadequately prepared for trial. He made protective motions, argued them, cross-examined witnesses and examined appellant.  Moreover, in denying the motion, the trial court relied on having been present throughout the proceedings: "Remember, I was in the trial" said the judge. "That's always helpful."

Further, appellant's statement that counsel did not meet with him to discuss prospective trial testimony was contradicted by the prosecutor's declaration.  We note, too, the self-serving nature of defendant's declaration and the absence of complaint during trial.

Additionally, we are not convinced that counsel was inadequate in failing to interview Israel Garcia. The range of what suffices as constitutionally adequate assistance is broad, and courts must accord presumptive deference to counsel's choices concerning allocation of time and resources on behalf of his or her client. (Strickland v. Washington, supra, 466 U.S. at pp. 689-691; People v. Gonzalez (1990) 51 Cal. 3d 1179, 1252, modified by statute on another ground, as stated in In re Steele (2004) 32 Cal. 4th 682, 691.) Thus, "[c]ounsel may make reasonable and informed decisions about how far to pursue particular lines of investigation." (People v. Gonzalez, supra, 51 Cal. 3d at p. 1252.)

Here, appellant testified that he doubted Israel would remember he had been at his house for 20 minutes on the morning of the murder. It was three years ago and he went over to his house daily. Moreover, he had tried, unsuccessfully, to contact Israel. Appellant thought he had moved. Against these circumstances it was not deficient for counsel to fail to track down Israel. We also point out that appellant did not submit the declaration of Israel or anyone else setting forth alibi testimony that they would have offered for the defense in the event of a new trial.

Id. at *14-15.

An IAC claim under the Sixth Amendment is reviewed under the two-prong test set forth in Strickland v. Washington, 466 U.S. 668 (1984). Under the first prong, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." Id. at 688. Because of the difficulties inherent in fairly evaluating counsel's performance, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. To satisfy the second prong under Strickland, petitioner must establish that he was prejudiced by counsel's substandard performance. See Gonzalez v. Knowles, 515 F.3d 1006, 1014 (9th Cir. 2008) (citing Strickland, 466 U.S. at 694).

29

1    Under AEDPA, a federal court is not to exercise its independent judgment in

2  assessing whether the state court decision applied the <u>Strickland</u> standard correctly; rather,

3  the petitioner must show that the state court applied <u>Strickland</u> to the facts of his case in an

4  objectively unreasonable manner.  <u>Bell v. Cone</u>, 535 U.S. 685, 699 (2002); <u>see also</u> <u>Cullen</u>

5  <u>v. Pinholster</u>, — U.S. —, 131 S. Ct. 1388, 1403 (2011) (federal habeas court's review of

6  state court's decision on ineffective assistance of counsel claim is "doubly deferential.").

7  The Supreme Court has specifically warned that: "Federal habeas courts must guard against

8  the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under

9  § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were

10  reasonable.  The question is whether *there is any reasonable argument* that counsel

11  satisfied <u>Strickland</u>'s deferential standard."  <u>Harrington v. Richter</u>, 562 U.S. 86, 105 (2011)

12  (emphasis added).

13    Here, the state appellate court's rejection of Petitioner's claim—that the trial court

14  erred in denying his motion for a new trial based on his IAC claim—was neither an

15  unreasonable determination of the facts nor an unreasonable application of clearly

16  established United States Supreme Court authority.  Furthermore, the duty to investigate "is

17  not limitless" and does not require that every conceivable avenue be investigated.  <u>Douglas</u>

18  <u>v. Woodford</u>, 316 F.3d 1079, 1088 (9th Cir. 2003); <u>Bobby v. Van Hook</u>, 130 S. Ct. 13, 19

19  (2009) (per curiam) ("there comes a point at which evidence . . . can reasonably be

20  expected to be only cumulative, and the search for it distractive from more important

21  duties"); <u>Rompilla v. Beard</u>, 545 U.S. 374, 381 (2005) ("In judging the defense's

22  investigation, as in applying <u>Strickland</u> generally, hindsight is discounted by pegging

23  adequacy to 'counsel's perspective at the time' investigative decisions are made.").  In the

24  absence of declarations from the witnesses demonstrating what they would have said at

25  trial, Petitioner cannot meet his burden to affirmatively show prejudice from the failure to

26  call the witnesses.  <u>See e.g.</u>, <u>Matylinsky v. Budge</u>, 577 F.3d 1083, 1096-97 (9th Cir. 2009)

27  (without informing the court as to the nature of the testimony, petitioner's general statement

28  in the petition that 41 witnesses would have testified to his good character failed to show

that counsel's decision to call a few select character witnesses was unreasonable); <u>Allen v. Woodford</u>, 395 F.3d 979, 1002 n.2 (9th Cir. 2005) ("the district court correctly disregarded the failure to call [three named witnesses], because Allen failed to make a showing that they would have testified if counsel had pursued them as witnesses"); <u>Dows v. Wood</u>, 211 F.3d 480, 486 (9th Cir. 2000) (petitioner presented no evidence that alleged alibi witness "actually exists, other than from Dows's self-serving affidavit," and could not show that witness would have presented helpful testimony because he failed to present affidavit from witness).

Petitioner also presented evidence that his trial counsel experienced disciplinary problems with the California State Bar in other cases.  Dkt. 1 at 51-52.  However, such disciplinary problems are not probative here because there is no connection shown between the trial counsel's performance at Petitioner's trial and any conduct leading to any alleged disciplinary problems or disbarment.  <u>See</u> <u>United States v. Mouzin</u>, 785 F.2d 682, 696-99 (9th Cir. 1986) (disbarment without more does not render counsel's services ineffective).

Accordingly, the state appellate court's rejection of Petitioner's claim—related to the denial of his motion for a new trial—is not contrary to, or an unreasonable application of, clearly-established federal law.  <u>See</u> 28 U.S.C. § 2254(d)(1).  Therefore, this claim is DENIED.

## IV.   <u>CERTIFICATE OF APPEALABILITY</u>

No certificate of appealability is warranted in this case.  For the reasons set out above, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong.  <u>See</u> <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.

## V.   <u>CONCLUSION</u>

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1      1.     All claims from the Petition are DENIED, and a certificate of appealability

2  will not issue.  Petitioner may seek a certificate of appealability from the Ninth Circuit

3  Court of Appeals.

4      2.     The Clerk shall enter judgment, terminate any pending matters, and close the

5  file.

6      IT IS SO ORDERED.

7  Dated: 1/20/16

_____
SAUNDRA BROWN ARMSTRONG
Senior United States District Judge

P:\PRO-SE\SBA\HC.10\Powers0365.denyHC-final11916.docx